**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-CR00161-001 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| v. | : | |
| | : | |
| CLINTON CORNELL, | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM**

Now comes Defendant Clinton "Clint" Cornell, by and through counsel, and respectfully submits the following sentencing memorandum intended to assist this Honorable Court in determining a sentence "sufficient, but not greater than necessary," to fulfill the sentencing purposes set forth in 18 U.S.C. § 3553(a). On December 16, 2020, Mr. Cornell pleaded guilty to one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349. The Guideline range set forth in the Presentence Investigation Report is 30 to 37 months. For the reasons set forth below, Mr. Cornell respectfully requests probation, or alternatively a sentence of home incarceration due to his diagnosis of Berger's disease, a kidney condition.

## I. Sentencing Guideline Calculation

Mr. Cornell respectfully disagrees with the Presentence Investigation Report's guideline range because of the loss calculation and the special skills enhancement.

### A. Mr. Cornell's exclusion from Medicare and Medicaid

Here, Mr. Cornell, as a result of a prior conviction, was barred from billing Medicare and Medicaid for medical services he provided. This case is about treatment provided by Mr. Cornell

1

that was billed to Medicare and Medicaid under Dr. Qureshi. This case is not about billing for care that was not provided. This case is not about providing inappropriate medical care.

### B. The Loss Amount

As a result of financial hardship from a prior conviction, discussed later in this memorandum, Mr. Cornell and his family moved to Ohio. Finding employment was difficult. Finally, he found a position with Tri-State Urgent Care, who was aware of his exclusion. As part of his employment, Mr. Cornell worked under Dr. Qureshi. Ultimately, Mr. Cornell did provide medical services to patients that were billed to Medicare and Medicaid under Dr. Qureshi's name.

Therefore, for the amount of loss, charges billed to clinicians other than Dr. Qureshi should not be included in the loss calculation. Mr. Cornell did not perform services under other physicians. Further, amounts billed under a facility name rather than a specific clinician, are similarly not attributable to Mr. Cornell. After deducting the amounts that do not have a causal link to Mr. Cornell from the government's excel spread sheet, the actual loss should be $93,395.

### C. "Special Skills" Enhancement

As stated in Mr. Cornell's objections to the initial PSR, the two-level enhancement for use of a special skill to significantly facilitate the commission or concealment of the offense is not applicable in this case. The issue in this case is not the treatment Mr. Cornell provided. Rather the issue turns on what information was typed onto a bill for medical services. There is no special skill involved in terms of inputting billing related information into a billing software system.

This case is like *United States v. Weinstock*, 153 F.3d 272 (6th Cir. 1998) and thus should have the same result. Weinstock practiced podiatry. *Id.* at 274.

> On June 27, 1995, the government indicted Weinstock on twenty-six counts mail fraud in violation of 18 U.S.C. § 1341. The indictment alleged that as a part of a fraudulent scheme, Weinstock would perform routine foot care and

> other services and would bill for treatments and surgical procedures that were
> not performed on the subscriber/patients, such as arthrocentesis procedures.

*Id.* On appeal, the government argued that the district court erred by not enhancing Weinstock's

offense level for using a "special skill." *Id.* at 281. "While admitting that being a podiatrist gave

him the opportunity to submit false bills, Weinstock argues that his podiatric skill did not facilitate

the crime within the meaning of the sentencing guidelines." *Id.* In reaching its decision, the Sixth

Circuit discussed an Eighth Circuit case, *United States v. Garfinkel*, 29 F.3d 1253 (8th Cir. 1994).

In that case, the "district court held that the defendant had used his managerial skills rather than

his medical skills to perpetrate the crime, and the Eighth Circuit affirmed the district court's

holding." *Id.* at 1261. The Sixth Circuit found the reasoning in *Garfinkel* and another case from

the Third Circuit to be persuasive and concluded that "Weinstock did not use his podiatric skills

to facilitate the crime." *Weinstock*, 153 F.3d at 281. Similarly, Mr. Cornell did not use his

physician's assist skills to facilitate the crime.

In contrast, in *United States v. Lewis*, the defendant, Jeffrey Lewis,

> submitted to the Kentucky Medical Assistance Program thousands of Medicaid
> Statement Dental Forms by mail certifying that he had performed dental
> procedures on Medicaid patients which he had in fact not performed. In
> accordance with his submissions, defendant received $1,000,000 in over-
> payments from Medicaid and the Kentucky Medical Assistance Program. To
> maximize his return, defendant submitted thousands of claims for complicated
> and, therefore, expensive procedures.

*United States v. Lewis*, 156 F.3d 656, 658 (6th Cir. 1998). Lewis was convicted of mail fraud. In

analyzing the application of a special skill enhancement, the Sixth Circuit concluded,

> While we concluded in *Weinstock* that falsely billing an insurance company for
> services not performed does not require a special skill, Lewis did not merely bill
> for services he did not perform. Rather, as the Presentence Investigation Report
> indicates, Lewis performed procedures on patients and then exaggerated the
> nature of the procedures in his billings to Medicaid. Unlike simply billing for a
> procedure that has not been performed, exaggerating the nature of a medical
> procedure does require the use of special medical knowledge."

*United States v. Lewis*, 156 F.3d 656, 659 (6th Cir. 1998). The case at hand is not like *Lewis*. The issue here is not exaggerating the nature of the medical procedure performed. The issue here is, instead of billing for appropriate services rendered by Mr. Cornell as being performed by Mr. Cornell, his name was swapped out for Dr. Qureshi's. This scenario is more akin to that in *Weinstock*.

## II.    Mr. Cornell's Personal History

Mr. Cornell was born in Flint, Michigan in 1972. He grew up primarily in Barryton, Michigan where he was raised by two loving parents and enjoyed the company of his two younger siblings. The family remained close, even as Mr. Cornell and his siblings found their own paths in life. His brother, Jeremiah Cornell, explained that to this day they speak regularly and get their families together as much as possible. *See* Jeremiah Cornell's Letter, attached as Exhibit A. Mr. Jeremiah Cornell described his brother as "one of the most selfless, caring, giving people [he] knows."

This close-knit family structure was not lost on Mr. Cornell. He has fostered and nurtured this dynamic in his own blended family. Mr. Cornell and his wife Antonia "Toni" Cornell recently celebrated 12 years of marriage. While the two do not have biological children together, they each bring three children from their previous marriages. When Mr. Cornell began his relationship with his first wife, she was a single mother to an infant son, Nick. *PSR*, R. 17, at ¶ 54. Mr. Cornell adopted Nick and treated him as his own. Mr. Cornell and his first wife later had two daughters, Ashley and Madey. When Mr. Cornell married Toni, he gained three step-children—Grace, Carly, and Zach. Toni noted that "despite the diversity in our family, Mr. Cornell is an incredible father to all of our children. He has been a mentor, leader, and protector of us all. He has no greater earthly priority than his family." Toni Cornell's Letter, attached as Exhibit B.

4

Mr. Cornell is also deeply devoted to his community and to the less fortunate. At the direction of Mr. Cornell, he and his family began volunteering with a local group called Kingdom Warriors, which provides meals, clothing, and other forms of support to the homeless of Cincinnati.[1]




Inspired by this work, Mr. Cornell bought his own food truck and provides food to those in need in Mt. Washington on a weekly basis. *Id.* His "Cinciphilly," a cheesesteak sandwich, is a fan favorite. *See* Kathy Vanciu's Letter, attached as Exhibit C. Mr. Cornell's devotion to his community has spread to his family, as Toni and their children join Mr. Cornell in his service. *See* Friends from the Community Letters, attached as Exhibit D. He has also led many people to volunteer with these organizations, inspiring many to give back to their communities. *Id.*

Mr. Cornell's passion for helping others started in Michigan where he worked for a volunteer ambulance service while in college. *PSR*, R. 17, at ¶ 85. Soon after, he was certified as

---

[1] The first picture is a group photo of the group Mr. Cornell and his wife organized to feed the homeless. The second picture is of Mr. Cornell and Johnathan Kollman, who authored a letter of support attached to this memorandum.

an Emergency Medical Technician (EMT), where he worked from 1992-1998. Motivated by his passion to continue helping others through medical service, he graduated in 2000 with a Master of Science from Central Michigan University and became a licensed physician's assistant. *Id.* at ¶ 79.

However, in 2013, he was convicted of Payment and Receipt of Healthcare Kickbacks in Michigan. As a result, he received a sentence that included fourteen months in prison. He learned a lot from this experience, realizing that his one priority in life—caring for his family—was significantly stunted. During his time in prison, he missed his son Nick's senior year and graduation from high school. *Exhibit B, Toni Cornell letter*. Nick started abusing alcohol, Mr. Cornell's daughter suffered a significant incident, and his father suffered from a major heart attack. *Id*. Mr. Cornell understood the impact of his decisions watching his family suffer from afar, but the reality that awaited him when he was released was hard to overcome.

The financial impact of the Michigan litigation was crippling to the family. Mr. Cornell and his wife exhausted their savings, investments, and children's college funds. *Id*. In the end, he and his wife lost their business and home in Michigan. They moved their family to Ohio, but they could not escape the financial burden they faced. These were the circumstances that led Mr. Cornell to the issues he is facing today; "It was poor judgement but judgement that was clouded for very personal reasons." *Id*.

Despite these legal matters, Mr. Cornell was adored by his patients. Former patients boasted about the time and care Mr. Cornell put into their treatment, which was unlike any medical attention they had experienced. *See* Former Patients' Letters, attached as Exhibit E. One stated, "Clint has always gone above and beyond for me, accessible after hours when needed and always willing to take the time to educate, explain things clearly and never makes me feel rushed." *Id*. Another expressed similarly that Mr. Cornell "left no stone unturned" when he had experienced a

reoccurring health concern. *Id*. Mr. Cornell's sister-in-law recalled several family vacations where friends or family would call him needing medical help and he was always more than willing to sit with and help them understand what was going on. *See* Exhibit C, Vanciu letter. Mr. Cornell's wife expressed similarly, "I can't tell you the number of patients I have heard speak of Clint and how he made their lives better." *Exhibit B, Toni Cornell letter*.

Mr. Cornell is working on himself. He has remained open and cooperative in his therapy and "assumed complete responsibility for his behaviors and actions." *PSR*, R. 17, at ¶ 72. Many of those in Mr. Cornell's support system have noticed a positive shift in his behavior. His sister-in-law noted that he "has been frustrated, angry, saddened and humbled by his mistakes over the past few years," but since then "has surrounded himself with positive people and is doing wonderful things for the community." *Exhibit C, Vanciu letter*. She added that she believes "he has learned from these mistakes and has adopted a positive path." *Id.* Mr. Cornell's counselor, Dr. Owen Clutterbuck, stated that, in response to the legal matter at hand, "Mr. Cornell is extremely repentant as evidenced by the multiple, positive attitude and behavior changes he has made in his life." *Dr. Clutterbuck's Letter*, attached as Exhibit F. Similarly, Mr. Cornell's pastor, Rev. Jonothan Kollmann noted that he has "seen a tremendous amount of remorse" in Mr. Cornell and that "[h]e has surrounded himself with an enormous amount of support […that] will be there for him in the future." *Rev. Kollmann's Letter*, attached as Exhibit G.

### III.    Mr. Cornell's kidney condition and other health concerns

One major concern from COVID-19 is the impact it has on the kidney. Early reports showed that, of those hospitalized with COVID-19 in China and New York, thirty percent of

patients developed moderate to severe kidney injury.[2] Mr. Cornell suffers from a kidney disease, specifically immunoglobulin (IgA) nephropathy.

As more fully described in a letter from Mr. Cornell's primary care provider, attached as Exhibit H, IgA nephropathy, also known as Berger's disease, is a condition that occurs when an antibody called immunoglobulin A ("IgA") builds up in the kidneys causing inflammation. Long-term, the disease disrupts the kidney's ability to filter waste from an individual's blood.[3] Importantly,

> There is no cure for IgA Nephropathy and management of the disease is focused on minimizing events that trigger damage to the kidneys such as **minimizing infections**, controlling cholesterol and blood pressure, and maximizing good nutrition and exercise."

*Exhibit H*, (emphasis added). Although his primary care provider states there is no long-term data on how COVID-19 infection may affect the kidney function of those with IgA Nephrophathy, he has "formulated a medical opinion that COVID infection will likely result in irreversible kidney damage leading Mr. Cornell closer to end stage kidney failure." *Id.*

To complicate matters, Mr. Cornell's medical team has recommended that he *not* get vaccinated. *See Letter from David Barney PA-C*, attached as Exhibit I. "Recent studies have demonstrated that following vaccination for COVID-19, a person begins to produce high levels of various antibodies, specifically IgA and IgG antibodies." *Id.* The spike in IgA could trigger an autoimmune attack that would harm the kidneys. *Id.* "My concern for Mr. Cornell is how severely the vaccine and the subsequent IgA antibody response will harm his kidney function. It is my

---

[2] *Coronavirus: Kidney Damage Caused by COVID-19*, JOHNS HOPKINS (May 14, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-kidney-damage-caused-by-covid19.

[3] *IgA nephropathy (Berger's Disease)*, MAYO CLINIC (Jul. 21, 2021) https://www.mayoclinic.org/diseases-conditions/iga-nephropathy/symptoms-causes/syc-20352268.

medical opinion, based on over 20 years of clinical practice that the risk of harm to Mr. Cornell is too great to warrant receiving the vaccine against COVID-19 at this time." *Id.*

In addition to Mr. Cornell's physical health issues, he also has a variety mental health concerns. He was formerly diagnosed with generalized anxiety disorder and adjustment disorder with mixed emotional fears, but after further evaluation was diagnosed and treated for posttraumatic stress disorder. *PSR*, R. 17, at ¶ 71. He also suffers from the following reported and apparent symptoms: "intermittent anger; guilt; subsequent anxiety; obsessive worry; difficulties with making most decisions; a pervasive fear of a loss of control; feeling misunderstood; mistrust of others;" etc. *Id.* at ¶ 73. These mental health concerns and his pending legal matters have exacerbated his chronic issues. *Id.* at ¶ 74. Coupled with the threat of Covid-19, Mr. Cornell's health faces a precarious future if he were to be sentenced to a term of incarceration. His counselor, Dr. Clutterbuck, noted that because "he does not present as any type of danger to himself or others, a reporting probation with continuation of psychological counseling is the more appropriate alternative for Mr. Cornell as opposed to incarceration." *Id*. at ¶ 76.

## IV.    Conclusion

In conclusion, Mr. Cornell acted out of desperation. His financial situation felt dire, and his judgement was subsequently clouded. Even so, Mr. Cornell is remorseful for his actions. He has learned so much through his mistakes and their repercussions. He has a tremendous amount of family and community support and has continued seeking counseling. Given his kidney condition, inconsideration with the 3553(a) factors, a sentence of probation or home incarceration would be more suitable than a term of actual incarceration.

Respectfully submitted,


**/s/ Stephanie F. Kessler**
STEPHANIE F. KESSLER (0092338)
MARTIN S. PINALES (0024570)
Pinales, Stachler, Young & Burrell Co., LPA
455 Delta Ave., Suite 105
Cincinnati, Ohio 45226
(513) 252-2733
(513) 252-2751
skessler@pinalesstachler.com


*Attorneys for Defendant Clint Cornell*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via this

Court's electronic filing system on all counsel of record on this 23rd day of April 2022.


**/s/ Stephanie F. Kessler**
STEPHANIE F. KESSLER (0092338)